**Willie Lee McDUFF and Carolyn Ann McDuff, as parents and next friends of Essie McDuff, a minor, Appellants,**

v.

**Herbert L. CHAMBERS, et al., Appellees.**

**No. 10–94–087–CV.**

Court of Appeals of Texas, Waco.

March 22, 1995.

Rehearing Overruled April 26, 1995.

Tina N. Hughes & Theodore G. Skarbowski, Houston, for appellants.

James A. Williams, LeAnn Wainscott Cross, & Robin J. Hill, Dallas, for appellees.

Before THOMAS, C.J., and CUMMINGS and VANCE, JJ.

## OPINION

THOMAS, Chief Justice.

This is a medical-malpractice case. Willie and Carolyn McDuff, suing as parents and next friends of their minor daughter, Essie, appeal from the take-nothing summary judgments rendered in favor of Dr. Herbert Chambers, individually, and the Chambers Medical and Surgical Clinic. We will reverse and remand.

### ALLEGATIONS AGAINST DR. CHAMBERS

The McDuffs generally alleged in their second amended petition that:

- Dr. Chambers, acting as the McDuffs' family physician, had treated Essie since her birth in January 1980;
- On or about July 1, 1980, Essie began to display symptoms of meningitis and was taken to a hospital's emergency room;
- Dr. Chambers was contacted but failed to attend this treatment;
- Due to his negligence Essie was sent home on July 1 without being cured or properly treated;
- Essie was admitted to the hospital on July 5, 1980, complaining of the same symptoms;
- Dr. Chambers and two other attending physicians failed to timely diagnose and treat Essie's meningitis and the complications that developed from it; and
- As a proximate result of Dr. Chambers' negligence, Essie suffered severe neurological impairment, permanent disfigurement, and monetary damages.

Also, in a stand-alone paragraph they expressly alleged a cause of action for medical abandonment:

Defendant Chambers also unilaterally severed the professional relationship with minor plaintiff without advance notice, without providing her adequate substitute care, and without allowing her a reasonable time to seek competent substitute medical services when there was still the necessity of continuing medical attention. In essence, he abandoned his patient.

Finally, they charged Dr. Chambers individually with these specific acts of negligence:

 (1) failure to provide Essie with reasonable advance notice of his unilateral severance of the doctor-patient relationship;

 (2) failure to timely and properly administer and monitor the correct dosage of drugs and narcotics;

 (3) failure to timely diagnose, evaluate and treat meningitis;

 (4) failure to appear at the hospital emergency room to treat Essie when contacted;

 (5) failure to seek timely consultation from a qualified physician during the course of treatment;

 (6) failure to perform timely diagnostic tests and to timely diagnose Essie's illness; and

 (7) failure to accurately monitor and intervene when the diagnostic tests were finally performed.

## ALLEGATIONS AGAINST CLINIC

The McDuffs also alleged in their second amended petition that Chambers Clinic, acting through its agents, servants, and employees, was negligent when it:

 (1) failed to provide on the premises a competent, qualified physician to treat Essie;

 (2) used non-physician personnel to offer medical care, treatment, and diagnosis; and

 (3) failed to properly supervise non-physician personnel when offering medical care, treatment, and diagnosis.

They alleged that these negligent acts were a proximate cause of Essie's injuries and damages.

## FIRST MOTION FOR PARTIAL SUMMARY JUDGMENT

Dr. Chambers and the Clinic first moved for a summary judgment on the cause of action for medical abandonment. Before the motion could be heard, however, the McDuffs timely filed a third amended petition in which they omitted any express allegation of medical abandonment and, furthermore, deleted the first and fourth acts of negligence specifically alleged against Dr. Chambers in their second amended petition—*i.e.*, that Dr. Chambers (1) failed to provide reasonable advance notice of his unilateral severance of the doctor-patient relationship, and (4) failed to appear at the hospital emergency room and treat Essie when contacted. They did, however, include two new allegations of negligence against Dr. Chambers: (1) failure to provide Essie with competent medical care in his absence; and (7) allowing a non-physician nurse to evaluate and diagnose Essie's condition. Instead of alleging that Dr. Chambers was guilty of these specific acts of negligence based on his own conduct, as they had done in the second amended petition, the McDuffs charged in their third amended petition that he was liable for these specific acts of negligence based on the actions of his agents, servants or employees.

In response to the third amended petition, Dr. Chambers and the Clinic filed a supplemental motion for a summary judgment in which they claimed that the allegations in the second and third amended petitions are "essentially identical" with respect to the pleading of medical abandonment. Although admitting that the McDuffs had dropped any express allegation of abandonment—including the specific allegation that Dr. Chambers had failed to provide his patient with reasonable advance notice of his unilateral severance of the doctor-patient relationship, Dr. Chambers and the Clinic nevertheless asserted that the McDuffs had merely "modified" their pleading of medical abandonment by inserting a new allegation that Dr. Chambers was negligent when he failed to provide Essie with competent medical care "in his absence."

On November 3, 1992, the court granted Dr. Chambers and the Clinic a partial summary judgment that the McDuffs take nothing on medical abandonment.

## SUMMARY JUDGMENT ON MEDICAL ABANDONMENT

The McDuffs' second point is that the court erred when it granted a partial summary judgment on medical abandonment, a

cause of action they claim was omitted from their third amended petition. Dr. Chambers and the Clinic contend, however, that the third amended petition alleged abandonment in a "more generalized" form.

Essentially, the dispute between the parties relates to the sufficiency of the pleading to state a cause of action for medical abandonment. *See Lee v. Dewbre*, 362 S.W.2d 900, 902–03 (Tex.Civ.App.—Amarillo 1962, no writ). The movants for summary judgment claim that the third amended petition was sufficient to allege medical abandonment. The non-movants insist that it was not. The court apparently resolved any doubt in favor of Dr. Chambers and the Clinic by granting them a take-nothing summary judgment on that claim.

■ We cannot say as a matter of law that the third amended petition gave fair notice that the McDuffs were asserting a claim for medical abandonment. *See* Tex. R.Civ.P. 47(a). Because we must resolve any doubt about the sufficiency of the pleading in favor of the McDuffs, not the movants', we hold that no such cause of action was alleged. *See Nixon v. Mr. Property Management*, 690 S.W.2d 546, 549 (Tex.1985) (holding that on appeal all doubts must be resolved in favor of the non-movant). Consequently, the court erred when it granted a summary judgment on an unpled cause of action. *See Langston v. Eagle Pub. Co.*, 719 S.W.2d 612, 628 (Tex. App.—Waco 1986, writ ref'd n.r.e.) (on rehearing).

■ Moreover, any dispute over the sufficiency of the pleading to state a cause of action for medical abandonment should have been determined by special exception in advance of the ruling on the motion for summary judgment. *See* Tex.R.Civ.P. 91. For example, if the court had ruled in response to a special exception that, even after dropping all express references to medical abandonment, the amended pleading contained other allegations sufficient to assert such a cause of action, the McDuffs could have amended their pleading further to remove any ambiguity in that regard and thereby avoided summary judgment on the only ground alleged in the motion. Thus, the court likewise erred when it allowed Dr. Chambers and the Clinic

to use a summary judgment rather than a special exception to test the sufficiency of the pleading. *See Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex.1983); *Texas Department of Corrections v. Herring*, 513 S.W.2d 6, 10 (Tex.1974).

For all of these reasons we sustain point two attacking the summary judgment that the McDuffs take nothing on a claim for medical abandonment. We do not reach points one, three, and four, all relating to whether the court refused to consider the McDuffs' response and accompanying evidence relating to the first motion for summary judgment.

## SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT

After the court granted a partial summary judgment that the McDuffs take nothing on medical abandonment, they filed a fourth amended petition in which they alleged the same specific acts of negligence against Dr. Chambers and the Clinic as they asserted in their third amended petition. They retained the allegation that Dr. Chambers was guilty of the specific acts of negligence based on the acts of his agents, servants or employees, as well as the allegations of negligence against the Clinic. Just as the McDuffs had done in all of their prior pleadings, they also alleged negligence causes of action against Dr. Sullivan Bryant and Dr. Lester Jennings, both of whom had purportedly treated Essie when she was admitted to the hospital on July 5, 1980. These two physicians, the McDuffs alleged, were acting as Dr. Chambers' ostensible agents in treating Essie.

Supported only by his affidavit as a medical expert, Dr. Chambers and the Clinic moved for a partial summary judgment on the grounds the evidence conclusively established that: (1) Dr. Chambers and the Clinic had complied with and not deviated from the applicable standard of care; (2) nothing they did, based on reasonable medical probability, could have caused Essie's damages; (3) Dr. Bryant and Dr. Jennings were not Dr. Chambers' agents, servants or employees and that he had never represented them to be such; and (4) all actions taken by Dr.

Bryant or Dr. Jennings were based on their own independent medical judgment.

The McDuffs responded in writing by attacking Dr. Chambers' affidavit as legally insufficient to support a summary judgment, asserting that it failed to establish an appropriate professional standard of care and that it contained legal conclusions, conclusory and incompetent opinions, and assertions incapable of being readily controverted. Carolyn McDuff's deposition, the affidavit of Dr. Raoul Wientzen, Jr., and certified copies of various hospital and Clinic records supported the response.

On October 29, 1993, the court granted a take-nothing summary judgment in favor of Dr. Chambers on all allegations of vicarious liability for any act of negligence allegedly committed by Dr. Bryant or Dr. Jennings and, likewise, granted the Clinic a take-nothing summary judgment on all acts of negligence asserted against it in the fourth amended petition.

## SUMMARY JUDGMENT ON VICARIOUS LIABILITY

■ Dr. Chambers essentially moved for a summary judgment on the grounds that the evidence conclusively negated (1) breach of duty, (2) causation, and (3) vicarious liability arising from an agency or employment relationship with Dr. Bryant or Dr. Jennings. However, the court expressly limited its summary judgment to the last ground asserted— *i.e.*, it decreed that the McDuffs take nothing on "all allegations of vicarious liability for any act of negligence allegedly committed by [Dr. Jennings or Dr. Bryant]." It did not render a summary judgment on either breach of duty or causation. When, as here, a court specifies the ground on which it renders summary judgment, the non-movant need only attack the particular grounds on which it is expressly granted, and the appellate court will not consider other grounds on which the summary judgment could have been based. *See State Farm Fire & Cas. Co. v. S.S.*, 858 S.W.2d 374, 380–81 (Tex.1993). Therefore, the McDuffs need only challenge the summary judgment on the ground that Dr. Chambers did not conclusively negate vicarious liability.

They do this in point five, which is directed at the portion of the summary judgment absolving Dr. Chambers of all vicarious liability for the negligent acts allegedly committed by Dr. Bryant and Dr. Jennings.

EXPRESS AGENCY

■ The owner's or principal's extent of control over the details of accomplishing the assigned task is what primarily distinguishes the relationship of independent contractor-owner from that of agent-principal. *See Carruth v. Valley Ready–Mix Concrete Co.*, 221 S.W.2d 584, 592 (Tex.Civ.App.—Eastland 1949, writ ref'd). A principal has the right to control the details of how the agent accomplishes the assigned task. *Spangler v. Jones*, 861 S.W.2d 392, 396 (Tex.App.—Dallas 1993, writ denied). Thus, to conclusively negate vicarious liability on his part, Dr. Chambers had to conclusively establish not only the details of his professional relationship with Dr. Bryant and Dr. Jennings, with regard to Essie's treatment, but also the extent of his right to control their actions in that respect.

These excerpts are from Dr. Chambers' affidavit:

Dr. Sullivan R. Bryant, the family practitioner, was on call for me at the time [Essie] was admitted to Methodist Medical Center on July 5, 1980. [Essie's] care was assumed by Dr. Bryant who subsequently turned [Essie's] care over to Dr. Lester Jennings, a pediatrician specialist.... The extent of my involvement in the care of [Essie] during her hospitalization at Methodist Medical Center from July 5, 1980, through July 13, 1980, was to review her chart after returning to town from my vacation.

. . . . .

On July 5, 1980, the care of [Essie] was assumed by Dr. Sullivan Bryant and, thereafter, transferred to Dr. Lester Jennings. *At no time did I represent in any fashion that these doctors were my "agents, servants, and/or employees." All actions taken by these doctors were based upon their independent medical judgment and were not dictated, influenced or suggested by myself or Chambers Medical and Surgical Clinic in any way. I deny that Drs. Lester [sic] or Jennings were the agents, servants, and/or*

*employees of myself or Chambers Medical and Surgical Clinic.*

. . . . .

During [Essie's] admission to Methodist Medical Center on or about July 5 through 13, 1980, I was on vacation and had obtained the agreement of Dr. Sullivan Bryant, a capable family practitioner with sufficient information to provide treatment to patients such as [Essie], to be on call for me and to provide necessary treatment to my patients. Dr. Sullivan Bryant did, in fact, provide care to [Essie] upon her admission to Methodist Medical Center on July 5, 1980. Thereafter, [Essie's] care was transferred to Dr. Lester E. Jennings, a pediatrician specialist.

(Emphasis added).

■ Dr. Chambers attempted to negate the control element of agency by stating that Dr. Bryant and Dr. Jennings acted upon their own independent medical judgment and that he did nothing to control or influence their actions. He addresses the control actually exercised, rather than negating the right of control. However, without a recitation of facts relating to the nature of the relationship and terms of the agreement between all three physicians with respect to Essie's treatment, his assertion that Dr. Bryant and Dr. Jennings acted upon their own independent medical judgment is nothing more than a conclusory opinion that is legally insufficient to support a summary judgment. *See Anderson v. Snider,* 808 S.W.2d 54, 55 (Tex. 1991) (holding that conclusory opinions in an affidavit of an expert witness are insufficient to support a summary judgment).

Furthermore, the McDuffs produced various hospital records showing that Dr. Chambers participated in Essie's treatment at Methodist Medical Center by prescribing medication, giving instructions to nursing personnel, and ordering medical procedures. Moreover, they supported their response with records from Dr. Chambers' office showing that he billed the McDuffs' insurance carrier for admitting Essie to the hospital and her follow-up hospital care. This evidence directly contradicts and casts doubt on the assertions in Dr. Chambers' affidavit that (1) his only involvement with Essie while she was in Methodist Medical Center was to "review her [hospital] chart after returning to town from my vacation"; (2) Dr. Bryant and Dr. Jennings acted upon "their own medical judgment"; and (3) their actions were not "dictated, influenced or suggested by myself . . . in any way." Moreover, it raises a genuine fact question on the nature of the professional relationship between the three physicians and the extent of control that Dr. Chambers, as Essie's primary physician, had and actually exercised over Dr. Bryant's and Dr. Jennings' actions. Accordingly, the evidence raises a fact question on express agency.

OSTENSIBLE AGENCY

■ Finally, the McDuffs alleged in their fourth amended petition that Dr. Bryant and Dr. Jennings were acting as Dr. Chambers' "ostensible agents." "Ostensible agency," also known as agency by estoppel or apparent agency, does not depend upon an express appointment or actual authority but arises from the words, attitude, conduct, and knowledge of the principal, not the agent. *Trahan v. Southland Life Insurance Company,* 155 Tex. 548, 289 S.W.2d 753, 755 (1956); *Prowse v. Whitehurst,* 313 S.W.2d 126, 129–30 (Tex.Civ.App.—San Antonio 1957, writ ref'd n.r.e.). In fact, an ostensible agent is not really an agent at all, but estoppel prevents the "principal" from denying the agency. *Bugh v. Word,* 424 S.W.2d 274, 276 (Tex.Civ.App.—Austin 1968, writ ref'd n.r.e.). Elements of ostensible agency are: (1) the third party—the McDuffs—must have a reasonable belief in the agent's—Dr. Bryant and Dr. Jennings—authority; (2) the belief must be generated by some holding out by act or neglect of the principal—Dr. Chambers; and (3) the third party—the McDuffs—must justifiably rely on the representation of authority. *See Nicholson v. Memorial Hosp. System,* 722 S.W.2d 746, 750 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) (citing *Ames v. Great Southern Bank,* 672 S.W.2d 447 (Tex.1984)).

■ The McDuffs alleged in their response that the summary-judgment evidence contains a fact question on agency. Carolyn McDuff's deposition and the documentary ev-

idence filed in support of the response established the following:

- Dr. Chambers was the McDuffs' family physician and they relied on his medical judgment and advice.

- Dr. Chambers admitted Essie to Methodist Medical Center on July 5, 1980, and participated to some extent in her care and treatment, along with Dr. Bryant and Dr. Jennings.

- Carolyn McDuff had met or seen Dr. Bryant at Dr. Chambers' clinic office where he had apparently worked.

- Dr. Chambers told her that he would have a "specialist" see Essie when she was admitted and Dr. Jennings would be "covering" for Dr. Chambers.

- Carolyn McDuff complained to Dr. Chambers that she "didn't like" Dr. Jennings and that she "didn't think he knew what he was doing," to which he responded, "Carolyn, you are really mean to him ... [Dr. Jennings] said that you [curse] him every day."

- Carolyn McDuff told Dr. Chambers that she wanted Essie moved from Methodist Medical Center and Dr. Chambers promptly transferred her that same day to Children's Hospital.

This evidence is sufficient to raise genuine fact issues on the control element of agency and on whether: (1) the McDuffs reasonably believed in the authority of Dr. Bryant and Dr. Jennings to act on Dr. Chambers' behalf; (2) their belief was generated by Dr. Chambers' acts, conduct or neglect in holding them out as acting on his behalf; and (3) they reasonably relied on a representation of authority. *See Nicholson*, 722 S.W.2d at 750.

Dr. Chambers argues, however, that Carolyn McDuff admitted in her deposition that he never represented to her that either Dr. Bryant or Dr. Jennings were acting on his behalf. He apparently bases that contention on this portion of her deposition:

Q. Did Dr. Chambers ever tell you that Dr. Bryant or Dr. Jennings worked for him?

A. No, I don't recall him saying that. No, he didn't tell me that.

Q. Was it your understanding that Dr. Jennings was a specialist who was providing some treatment for Essie?

A. Okay. Only thing that I really remember is Dr. Chambers said that when he had her admitted that he would have a specialist there to treat her since he was on vacation. That's all I remember.

. . . . .

Q. Can you recall any other statements that Dr. Chambers made that pertain to Dr. Jennings providing any sort of care for Essie?

A. No, I don't recall.

. . . . .

Q. .... Do you have any reason to believe that Dr. Jennings or Dr. Bryant was an employee of Dr. Chambers or Chambers Medical & Surgical Clinic?

A. No. He never told me he was his employee.

Q. Do you have any reason to believe that Dr. Jennings or Dr. Bryant was an agent of Dr. Chambers or Chambers Medical & Surgical Clinic?

A. What do you mean by "agent"?

Q. Someone acting on the behalf of Dr. Chambers or the Chambers Medical & Surgical Clinic.

. . . . .

A. Really, I don't know. I don't know that.

Q. Did you have any communications with Dr. Chambers or anyone at Chambers Medical & Surgical Clinic that pertained to Dr. Bryant or Dr. Jennings other than those we've already discussed—or the one that we've already discussed?

A. No, none that I recall.

These excerpts from Carolyn's deposition do not conclusively establish that she admitted that no representations were made by Dr. Chambers. Any doubt in that regard must be resolved in the McDuff's favor. *See Mr. Property Management*, 690 S.W.2d at 549.

**500**

Moreover, Dr. Chambers contends that he conclusively negated agency and ostensible agency by asserting in his affidavit:

> At no time did I represent in any fashion that these doctors were my "agents, servants, and/or employees." All actions taken by these doctors were based upon their independent medical judgment and were not dictated, influenced or suggested by myself or Chambers Medical and Surgical Clinic in any way. I deny that Drs. Lester [sic] or Jennings were the agents, servants, and/or employees of myself or Chambers Medical and Surgical Clinic.

All of these statements are mere naked conclusory opinions on Dr. Chambers' part, which are legally insufficient to support a summary judgment in his favor on vicarious liability based on agency. *See Anderson*, 808 S.W.2d at 55. As already noted, ostensible agency can arise from the principal's words, attitude, conduct, and knowledge, and need not arise just from words or verbal representations alone. *See Trahan*, 289 S.W.2d at 755; *Prowse*, 313 S.W.2d at 129–30. The evidence produced by the McDuffs, at the least, contradicts these assertions to the extent that genuine fact issues exist on the elements of ostensible agency.

EMPLOYEE

 Dr. Chambers also sought to negate any vicarious liability arising from an employee-employer relationship with Dr. Bryant or Dr. Jennings. However, absent any background facts showing the nature of the professional relationship and agreement between the parties, merely stating that the employer-employee relationship does not exist is, again, nothing more than a legal conclusion on Dr. Chambers' part. Such is legally insufficient to support a summary judgment in his favor on vicarious liability arising from the employer-employee status. *See Anderson*, 808 S.W.2d at 55.

Accordingly, Dr. Chambers is not entitled to judgment as a matter of law on the ground that he had conclusively negated vicarious liability arising from the acts of Dr. Bryant or Dr. Jennings based on the relationship of principal-agent or employer-employee.[1] We sustain point five.

## CLINIC'S SUMMARY JUDGMENT

The McDuffs alleged in their fourth amended petition that Chambers Clinic, acting through its agents, servants, and employees, was negligent when it:

(1) failed to provide on the premises a competent, qualified physician to treat Essie;

(2) used non-physician personnel to offer medical care, treatment, and diagnosis; and

(3) failed to properly supervise non-physician personnel when offering medical care, treatment, and diagnosis.

They alleged that these negligent acts were a proximate cause of Essie's injuries and damages.

The Clinic moved for a summary judgment on all acts of negligence alleged against it in the fourth amended petition on the ground that Dr. Chambers' affidavit conclusively established that it did not deviate from the applicable standard of care and that nothing it did or failed to do was a cause of Essie's damages. Dr. Chambers made these assertions in his affidavit:

> I deny that I failed in any respect to do that which a reasonable, prudent doctor of osteopathy or medical doctor engaged in the practice of family practice would have done under the same or similar circumstances. Furthermore, I deny that Chambers Medical and Surgical Clinic failed in any respect to do that which a medical and surgical clinic would be required to do under the same or similar circumstances.... Based on reasonable medical probability, no act or omission on my part or the part of Chambers Medical and Surgical Clinic could have caused any injury or damage to [Essie].

---

[1] Neither Dr. Chambers nor the Clinic ever moved for a summary judgment on the ground that they were not liable to the McDuffs based on the acts of Nurse Baskin, an employee at the Clinic, and they did not present any summary judgment evidence conclusively negating liability based on Nurse Baskin's actions. The McDuffs' evidence relating to Baskin is discussed in connection with the partial summary judgment for the Clinic.

The McDuffs responded with summary-judgment evidence in the form of Carolyn McDuff's deposition and an expert affidavit from Dr. Raoul Wientzen. Carolyn McDuff generally related the following facts in her deposition. She called Dr. Chambers at home on July 2, 1980, to tell him that Essie's symptoms of fever, loss of appetite, and crying when she was touched had not improved from the day before. He told her to bring Essie to his clinic. Dr. Chambers did not come to the clinic but allowed his nurse to examine Essie and to report her condition to him by phone. Nurse Baskin, who examined Essie at the clinic, informed Dr. Chambers by phone "that it appeared to her that the baby was doing fine" and that Carolyn was merely a "worrywart." Baskin then told Carolyn that Dr. Chambers said to keep Essie on clear liquids and to call him back if she did not improve.

Dr. Wientzen, a board-certified pediatrician, in referring to Carolyn's testimony relating the incident at the clinic, stated in his affidavit:

> The applicable standard of care would have been for Dr. Chambers to physically examine Essie himself, not allow his nurse to attempt a diagnosis of the child as testified to by Mrs. McDuff. Dr. Chambers breached the standard of care by allowing his nurse to examine, evaluate and diagnose Essie McDuff's problems.

■ The evidence is undisputed that Dr. Chambers is an owner, employee or agent of the Clinic. Neither he nor the Clinic ever disputed Carolyn McDuff's testimony that Dr. Chambers allowed a nurse at his Clinic to examine Essie, diagnose her medical problems, and then report her condition and the nurse's diagnosis to him by phone. Dr. Chambers' allegation that he and the Clinic did not fail to act as a reasonably prudent doctor and clinic would act under the same or similar circumstances is, once again, a conclusory opinion that will not support a summary judgment in their favor. *See Anderson*, 808 S.W.2d at 55.

Even if we assume that these assertions on Dr. Chambers' part are competent summary-judgment evidence, Dr. Wientzen's affidavit raises fact questions on the applicable standard of care and whether Dr. Chambers and the Clinic deviated from it. Thus, the Clinic is not entitled to a judgment as a matter of law on the acts of negligence alleged against it. We sustain point six in which the McDuffs attack the summary judgment rendered in favor of the Clinic.

## DISPOSITION

We reverse the summary judgments rendered in favor of Dr. Chambers and the Clinic and remand all causes for a trial.